FILED

2016 Mar-31  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **ELLIOTT CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  7:14-CV-1409-SLB** |
| | ) | |
| **CELLCO   PARTNERSHIP,   doing business as Verizon Wireless,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 36.) Plaintiff Elliott Carter has sued his former employer, defendant Cellco Partnership, alleging that defendant discriminated against him on the basis of his race and gender and that it retaliated against him for complaining about discrimination.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 36), is due to be granted in part and denied in part.

## I.  <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and

show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

   In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.   "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"   *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).   Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v.*

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. STATEMENT OF FACTS

Cellco hired Carter, an African-American male, in December 2007 as a retail sales representative in its Tuscaloosa store. (Doc. 38-1 at 6-7 [Carter's Depo. at 12-14].) Retail sales representatives sell wireless phones and services to individuals and small businesses. Carter received training on Cellco's policies, including its Code of Conduct and Selling with Integrity. (*Id*. at 40, 42 [Carter's Depo. at 147-48, 157].) As a retail sales representative, Carter was paid both a base salary and commission. (*Id*. at 39-40 [Carter's Depo. at 145-46].) Each time he sold a phone, accessory, or new line of service, he would receive a credit towards his commission quota, or, if he had met his quota, he would receive commission. (*Id.* at 40 [Carter's Depo. at 146-47].) According to Carter, Ken Griffin, his store manager, appointed him as the small business representative in the Tuscaloosa store, and, in this position, Carter participated in weekly conference calls to generate new business sales.[1] (*Id*. at 7-8 [Carter's Depo. at 14-15, 20].)

---

[1]Griffin testified that he did not recall making such an appointment. (Doc. 38-3 ast 12 [Griffin Depo. at 42].) However, for purposes of summary judgment, the court will assume Carter's testimony is true.

3

On or before May 12, 2012, Carter saw a posting for an available Business Account Executive [BAE] position and applied.  (*Id*. 38-1 at 8 [Carter's Depo. at 21].)    Because of his business sales experience, he believed he would be a good fit for the BAE position.  (*Id*. at 6 [Carter's Depo. at 13].)  Monica Pate, a white female, made the hiring decisions for her BAE positions.  (Doc. 38-6 at 9 [Pate's Depo. at 30].)  On May 12, 2012, Carter applied for the BAE position.  (Doc. 42-7.)

The day Carter applied for the BAE position he talked to Pate, and she told him about some of the qualifications for the position, that the position was challenging, and some things that he could look forward to as a BAE; she did not mention her requirement that, to be considered for a BAE position, the applicant had to participate in her "mentor program." (Doc. 38-1 at 9-10 [Carter's Depo. at 25-28].)  Carter also talked to Griffin about the BAE position, and Griffin told Carter he would be a "good fit" for the position.  (*Id*. at 10 [Carter's Depo. at 29].)  Griffin testified that Carter was not qualified to hold a BAE position based on his annual reviews. (Doc. 38-3 at 12 [Griffin's Depo. at 43].)  However, for purposes of deciding Cellco's Motion for Summary Judgment the court assumes that Griffin told Carter he was a "good fit" for the BAE position.

Applications for the BAE position went through HR to be screened before they were sent to Pate.  (Doc. 38-6 at 16 [Pate's Depo. at 59-60].)  David Giegel, district manager (white), testified that he would interview the slate of candidates HR sent to him to find the "best person that was available," but he did not recall if he was required to interview every applicant on the slate. (Doc. 42-3 at 6 [Giegel's Depo. at 20].)  Pate testified that she did not

4

interview every applicant on the slate from HR and that she did not know of a policy that she was required to interview all candidates on the slate.  (Doc. 38-6 at 15-16 [Pate's Depo. at 55-57, 60].)  Carter was included on the slate of qualified applicants for the BAE position. (*Id*. at 15 [Pate's Depo. at 54-55].)

Pate testified that she did not interview Carter because he had not contacted her or mentored with the business sales division prior to submitting his application.  (*Id*. at 22-23 [Pate's Depo. at 84-85]; *see* doc. 38-2 at 2.)  According to her deposition testimony, the "mentor program" [were] created "to make sure that [interested individuals] really understood what business sales was about before applying."  (*Id*. at 9 [Pate's Depo. at 31].) She described the mentor program as follows:

> It was individuals who were interested reaching out to me first to say, I'm interested.  From that point, each individual person would work with me one on one to discuss questions that they had about the business or some sat in on calls with my current business account executives . . . .  The mentoring program was different for each individual, just based on what they wanted to learn about business sales.

(*Id*. [Pate's Depo. at 32].)

Pate selected Robin Harris, a white female who was working as a retail sales representative at the Tuscaloosa store with Carter, for the BAE position.  Harris applied for the BAE position on May 15, 2012, and Pate interviewed her two days later on May 17, 2012.  (Doc. 42-6; doc. 42-9.)  Pate made the decision to offer the BAE position to Harris on the same day she interviewed Harris – May 17, 2012.  (Doc. 38-6 at 23-24 [Pate Depo. at 88-89].)

5

Harris had started working at the Tuscaloosa store as a greeter in December 2009; she was employed through a temp agency. (Doc. 42-1 at 6 [Harris's Depo. at 17].) Thereafter, Harris applied for, and received, a position with Cellco as a customer service employee, a non-sales position. (*Id*. at 6, 16 [Harris's Depo. at 19, 59]; doc. 42-16.) Later she moved to a position of a retail sales associate. (Doc. 42-1 at 16 [Harris's Depo. at 59]; doc. 42-16.) Pate admits Carter had more experience with Cellco than Harris at the time they applied for the BAE position. (Doc. 38-6 at 20 [Pate's Depo. at 73-76].) Also, Carter had five years of experience working for another wireless company. (*See* doc. 42-7.) Pate considered prior sales experience at another wireless company was relevant experience because the experience would help the person selected do the BAE job. (Doc. 38-6 at 17 [Pate's Depo. at 64].) Harris did not have any sales experience prior to beginning work for Cellco.

On her application for the BAE position, Harris did not mention participating in a mentor program. (Doc. 42-9.) She testified that she did not participate in a formal mentor program before her selection for the BAE position; she said:

> Q. . . . Did you attend any mentoring program at any time?
>
> A. It wasn't a – it was a very casual mentor program, so I did not list that.
>
> Q. . . . [T]ell me about the mentoring program. What did you do?
>
> A. ***There were just conversations with Monica Pate*** on job experience, what I needed to do for business exposure, how to get – you know, like I said, steps to take to get to the next level. The questions are always, in interviews, where do you see yourself in the next five years? How do you plan to get there? Those are the kinds of things that I just discussed with her.

6

Q.  But you talked with her about moving into a sales position from the customer service rep position?

A.  Through e-mail, I did.

Q.  So these were just general conversations that you had with her when you were in your current position on how to move to the next position?

. . .

A.  They were conversations with her that I would not really feel comfortable with other people.  She took – she had been promoted very quickly.

. . .

A.  And so I looked at her as a mentor.  And those are the – that's why I went to her.  *So there were e-mails.  There were phone calls.  They were when she would stop in to visit.*

Q.  Well, you've told me everything that you recall talking with her about regarding the business sales position.  Did you do anything to mentor other than talk to Monica Pate before you applied for this business sales position?

A.  Yes.  *Mandy Cannon was the sales rep or business sales representative at the time that came into the Tuscaloosa store.  I spoke with her.*

Q.  When did you speak with her?

A.  I don't remember.

Q.  Did you speak with her one time or more than one time?

A.  *Just, actually, two times, and also Jake Gooden, he was the sales rep or the business sales after her, and introduced to him and just spoke with him about the Tuscaloosa area and businesses and how to generate small business deals and lease to submit to close those deals.*

7

Q.  And the two times you talked to Mandy Cannon, were those in the [Tuscaloosa] store?

A.  I believe so, yes.

Q.  What did y'all talk about?

A.  We just talked the same thing that Jake Gooden did in the Tuscaloosa area, how to generate business deals, getting a better relationship through retail and small business.

(Doc. 42-1 at 13-14 [Harris's Depo. at 47-50 (emphasis added)].)  Harris did not participate in any ride-along program or sit in on sales calls.  (*Id*. at 15 [Harris's Depo. at 54-55].)  Pate testified to her recollection of Harris's participation in the "mentor program":

Q.  . . . And then Robin Harris, did she do anything to mentor?

A.  ***She reached out to me, I remember on a visit to the store, and she told me she was interested in the opportunity.***

Q.  Anything else?

A.  ***She called Jake Gooden, and [Mandy] Cannon was also in that territory, but had moved on to a different territory.  So she called them to get to know them.***

Q.  Anything else?

A.  ***She did come to my office to meet with me and talk about the territory.***

Q.  Anything else?

A.  And Robin was very good at closing business R to B deals, which is the retail to business splits . . . .

Q.  Okay.  Anything else?

A.  I can't recall anything else.

8

(Doc. 38-6 at 13 [Pate's Depo. at 47-48 (emphasis added)].)   Harris never rode with any BAE employees before she was interviewed and selected by Pate for the BAE position. (Doc. 42-1 at 15 [Harris's Depo. at 54-55].)

Pate made the decision to hire Harris five days after Carter applied for the position and before she had told him that she would not interview him.   On May 17, 2012, Pate interviewed Harris.   (*See* doc. 42-6.)   She used the Interview Evaluation form to document scores, ratings, and interview details for an applicant following an interview.   (Doc. 38-6 at 24 [Pate's Depo. at 89].)   The Interview Evaluation form, completed by Pate, stated that Harris's overall rating was "much more than acceptable" and that the recommendation was to "make offer."   (*Id*. at 20 [Pate's Depo. at 77]; doc. 42-6.)   Pate testified that she told Harris the day of her interview that she was going to give Harris the job.   (Doc. 38-6 at 22 [Pate's Depo. at 81-82].)

Carter testified that he did not know if Harris had participated in a mentor program. (*Id*. at 13 [Carter's Depo. at 39].)   Although Pate testified that every employee she had hired for a business sales position had participated in her mentor program, (*see* doc. 38-6 at 12-13 [Pate's Depo. at 43-48]), the job posting did not state participating in a mentor program, or contacting Pate and indicating interest in the job before applying, were requirements for an interview or for selection.   Pate testified:

> Q.  . . .  Do you think that you had any duty or obligation to interview Elliott Carter?
>
> A.  Not after I mentioned that he should join the mentoring program before.

Q.  When did you mention that first to him?

A.  We had a phone conversation, I don't remember when, about the mentoring program.

Q.  Was that before or after he applied for the job?

A.  After.

Q.  . . .  Before he applied for the job, did you ever say to him, Hey, we have this informal mentoring program?

A.  I don't recall saying that to him or [to] anyone specifically.

Q.  Did you ever tell Elliott . . . I'm not going to interview you?

A.  In an e-mail after we had the phone conversation after never having talk[ed] to him that I can recall about him being interested in [business sales], I asked that he come and learn about the position.  I don't recall how I said it, but come and mentor with me first so that we can see if this is a good fit, and he agreed.

Q.  Did it say anything on the job application that the applicant had to contact you first and express interest in the job before [he] could be considered?

A.  No.

Q.  Was that a requirement?

A.  Not a requirement.

(Doc. 38-6 at 22-23 [Pate's Depo. at 84-86].)

On May 23, 2012, after she had selected Harris, Pate sent an email to Carter stating that she wanted him to "mentor with [her] team" before she would "move forward with an interview." (Doc. 38-2 at 2.)  Pate did not interview Carter for the available BAE position. (Doc. 38-6 at 23 [Pate's Depo. at 86-87].)

Carter never knew there was any mentor program at any time before Harris was selected for the BAE position. (Doc. 38-1 at 12-13 [Carter's Depo. at 36-38].) Pate talked to Carter, after Harris had been selected for the BAE position, and she recommended that Carter come to Birmingham on his off days to ride along with some of the sales representatives to see how they conducted sales. (*Id*. at 12 [Carter's Depo. at 35-37].) Carter never reached out to Pate about mentoring because he was terminated shortly after his conversation with Pate. (*Id*. at 13 [Carter's Depo. at 38].)

Although Pate never interviewed Carter for the BAE position, she filled out an Interview Evaluation form and submitted it to Human Resources [HR]; this form indicated that Pate had interviewed Carter for the BAE position on May 23, 2012. (Doc. 38-6 at 23 [Pate's Depo. at 86-87]; doc. 42-8.) Pate testified that she did not know where she obtained the information used to rate Carter on the form; nothing on the Interview Evaluation form came from an interview with Carter. (Doc. 38-6 at 23-24 [Pate's Depo. at 88-90].) Pate rated Carter as a "Less Than Acceptable" applicant. (Doc. 42-8.) She noted on this form that the "feedback" from Griffin and Giegel about Carter "was not good." (*Id*.) She testified, however, that she could not recall anything Griffin or Giegel may have told her about Carter. (Doc. 38-6 at 24-25 [Pate's Depo. at 92-93].) Griffin testified he had talked to Pate about Carter only after she had selected Harris for the BAE position. (Doc. 38-3 at 9 [Griffin Depo. at 30-31].) Giegel testified that he did not remember talking to Pate about Carter's application for the BAE position, whether Carter would make a good BAE, and/or how Carter was doing in retail sales. (Doc. 42-3 at 25 [Giegel's Depo. at 93-94].) Pate concedes

11

that the Interview Evaluation form is "inaccurate" as it appears to show that she actually

interviewed Carter for the available BAE position on May 23, 2012. (Doc. 38-6 at 26 [Pate's

Depo. at 99-100]; *see* doc. 42-8.)

Pate hired three BAEs during her tenure as the hiring manager.  (Doc. 38-6 at 12

[Pate's Depo. at 42].)  According to Pate, all three of the selected applicants – Harris, Joseph

Heckle, and Jeff Moon – had participated in her mentor program.  (*See id.* at 12-13 [Pate's

Depo. at  43-48].)  All three individuals are white.  (*Id*. at 25 [Pate's Depo. at 93].)

With regard to Moon, Pate testified:

> He reached out to me.  He was a retail rep in Cullman, and he called me
> and said:  I want to be a business account executive.  I said:  Great.  I'm glad
> to hear it.  Tell me why.  And we began conversations over the phone about
> his background and why he was interested in the position.

(Doc. 38-6 at 12 [Pate's Depo. at 43].)  Moon met with her and spent time with other BAEs

making sales calls.  (*Id*. [Pate's Depo. at 44].)  He also called his district manager and

expressed an interest in the BAE position; Pate considered this to be part of his mentor

program.  (*Id*. [Pate's Depo. at 44].)

With regard to Heckle, Pate testified that he told her "he was interested in a BAE

position;" he also came on a number of occasions to be with other BAEs when they made

sales calls, he attended a Monday morning meeting to meet the other BAEs, and he drove

around the prospective territory.  (*Id*. at 13 [Pate's Depo. at 46-47].)

After Harris was selected for the BAE position, Carter complained to Griffin that

Harris got the BAE job because she was a white female and that he was not selected because

he was a black male.  (Doc. 38-1 at 17, 75 [Carter's Depo. at 54-55, 57, 287-88].)  Griffin

denies that Carter made such a complaint.  (Doc. 38-3 at 9-10 [Griffin's Depo. at 31-33].)

However, for purposes of deciding Cellco's Motion for Summary Judgment, the court will

assume Carter made such a complaint.  According to Carter, Griffin told him, "We as black

people, you know, we have to work hard, and that, you know, throughout society things like

this happen;" and, "[Y]ou can't let that get [you] down."  (Doc. 38-1 at 17 [Carter's Depo.

at 56].)

Cellco has a zero tolerance policy regarding discrimination or retaliation.  (Doc. 42-2

at 10 [Dennis's Depo. at 34].)  Its managers are trained to contact HR if an employee

complains about discrimination and that all such complaints will be investigated.  (*Id*. at 7,

9 [Dennis's Depo. at 24, 31]; doc. 42-3 at 10 [Giegel's Depo. at 35].)  Michele Dennis, an

HR consultant, testified that an employee complaining he did not get a job because he is a

black male would be a complaint of discrimination and this complaint should be reported to

HR.  (Doc. 42-2 at 4, 10 [Dennis's Depo. at 11-12, 33].)

Cellco prohibits sales representatives from using the electronic serial numbers [ESN]

from a HopeLine phone,[2] or any other inactive devices, to process device upgrades, add

additional lines of service, or any other sales transactions.  (Doc. 38-3 at 19 [Griffin's Depo.

at 71]; doc. 38-4 at 48-49 [Bryant's Depo. at 185-89].)  On three occasions – February 16,

---

[2]The HopeLine Program allows customers to donate their old, inactive phones and
Cellco distributes the phones to victims of domestic abuse for use in emergencies.  (*See* doc.
36-1 at 22 [Carter's Depo. at 76].)

2012, March 2, 2012, and April 28, 2012, Cellco's records showed that Carter used ESNs from previously owned devices to process sales transactions. (Doc. 38-1 at 29-30 [Carter's Depo. at 103-05, 106-07]; doc. 38-2 at 4.)

Cellco's Code of Conduct requires all sales representatives to create accurate records and properly use both its property and property entrusted to it by others; specifically, the Code of Conduct provides:

### 3.1.1  Creating accurate records

You must create accurate records that reflect the true nature of the transactions and activities that they record . . . .

. . .  It is also improper to intentionally take any action that leads to the creation of false or misleading records . . . .

. . .

### 3.3 Proper Use of Verizon Wireless' Property and Property Owned by Others

You must always protect Verizon Wireless' tangible and intangible property and any property entrusted to your care by customers or business providers. Company property and the property of co-workers, customers and business providers may not be taken, sold, loaned, given away or otherwise disposed of, regardless of its condition or value, without specific authorization. Property includes, but is not limited to, tangible property, data, records, and all communications.

(Doc. 38-2 at 28-19.)  Cellco's policies prohibit the use of HopeLine phones or any other inactive ESNs to process sales transactions.  (Doc. 38-3 at 19 [Griffin's Depo. at 71]; doc. 38-4 at 48 [Bryant's Depo. at 185-88].)  Employees who activate a new line of service and then place an inactive ESN on the new line would be able to engage in a fraudulent scheme

that manipulated Cellco's billing systems to create false records and could cause the company to lose money. (Doc. 38-4 at 48-50 [Bryant's Depo. at 187-89, 192-96].)

According to Griffin, in December 2011, during a Friday morning meeting, he provided specific training to the employees at the Tuscaloosa store on Cellco's policy regarding its prohibition on the use of inactive ESNs. (Doc. 38-3 at 19 [Griffin's Depo at 69-71].) Griffin distributed written materials that stated, in pertinent part, "Employees who knowingly activate new service with the intention of placing a non-working ESN on the customers new MTN [mobile telephone number] are not compliant with our companywide code of conduct guidelines." (Doc. 38-3 at 20 [Griffin's Depo. at 75-76] ; 42-17.) He is not 100% sure that Carter ever got a copy of the written material. (Doc. 38-3 at 21 [Griffin's Depo. at 77-78].) Carter testified that he did not recall Griffin having any Friday morning meetings in 2011. (Doc. 38-1 at 41 [Carter's Depo. at 150].) According to Carter, there were meetings, but they were to discuss sales, not policy, and were conducted by other managers. (Doc. 38-1 at 41-42 [Carter's Depo. at 150, 155-56].).

However, the use of HopeLine ESN numbers was a common practice; in fact, some managers had instructed employees to use the ESN number from a HopeLine phone. (Doc. 42-4 at 3-4, ¶¶ 5, 10; doc. 42-5 at 3-5 ¶¶ 7-8, 12, 16-17.) Carter testified that he was taught by his store managers before Griffin to conduct transactions using the ESN from an inactive device and that he had performed this type transaction thousands of times. (Doc. 38-1 at 23 [Carter's Depo. at 78].) Cedric Atchison, an employee at Trussville store, was told by Kerry Gould, as store manager and district manager, to use the ESNs of HopeLine phones to

complete transactions.  (Doc. 42-5 at 5, ¶¶ 16-17.)  Atchison testified that he used a HopeLine phone everyday when he worked under Gould and that he had continued to use HopeLine phones routinely when he moved to a retail sales position under the same management.  (*Id*. ¶ 17.)

Sometime before May 23, 2012, Carter's three non-compliant transactions appeared on a report reviewed by Josh Bryant, a senior analyst in the compliance department.  (Doc. 38-4 at 24-25 [Bryant's Depo. at 91-93].)  Bryant determined that the transactions could have resulted in fraud in violation of Cellco's policy, and he notified Carter's store manager, Griffin.  (Doc. 38-4 at 33 [Bryant's Depo. at 126]; doc. 38-3 at 25-26 [Griffin's Depo. at 96-97]; *see* doc. 38-5 at 68.)  According to Bryant, the end result of the scheme is that the customer received a free or discounted smartphone, but he or she is no longer paying for the data package that would have allowed Cellco to recoup the costs of offering the smartphone at a discounted price. (Doc. 38-4 at 50 [Bryant's Depo. at 197-98].)  Presumably, Carter received commissions on the transactions.  (*Id*. at 33 [Bryant's Depo. at 127-28].)  However, Bryant never talked to Carter about the transactions at issue.  (*Id*. at 17 [Bryant's Depo. at 63].)  Before Bryant received the compliance report that triggered the investigation into Carter's use of the ESN on HopeLine phones, he had never heard of Carter, he did not know Carter had applied for a promotion, and he did not know Carter's race or his gender.  (*Id*. at 46-47 [Bryant's Depo. at 179-81].)

Bryant noticed irregularities at other stores as well, including Anniston, Carrollton, Ft. Payne, Cullman, Auburn, Florence, and Warner Robbins.  (*Id*. at 27-28 [Bryant's Depo.

16

at 104-05].)  He contacted the Anniston store manager because the transactions on the report were very similar to the transactions at the Tuscaloosa store.  (*Id*. at 29 [Bryant's Depo. at 111].)  To the best of his recollection, no one was terminated from the Anniston store, but he said that information would not be shared with the compliance department.  (*Id*. at 30 [Bryant's Depo. at 113].)  Bryant did not recall whether he had contacted any other store managers about information in this report.  (*Id*. [Bryant's Depo. at 114].)

Bryant testified that he told Griffin that "these are transactions that I've reviewed. They are excessive, and . . . he [Griffin] should look into them to determine if there was any type of commission fraud."  (*Id*. at 33 [Bryant's Depo. at 126].)  Bryant followed up with an email to Griffin, in which Bryant wrote:

> Thanks for taking the time to speak with me today concerning the attached activity.  As mentioned, the purpose of this report is to ensure that the handsets a customer donates or leaves in a store after upgrading to new equipment [are] not used to process new sales or activities on unrelated accounts.
>
> Research . . . of these records indicates the ESN in question is used as an upgrade manipulation tool for [a] customer desiring a smart phone upgrade, but [who] wish to cancel the data plan with a feature phone.  While aiding a customer in data plan removal is a direct violation of selling with integrity, the issue is further complicated by the possible inappropriate acquisition of the feature phone.  Take note that each ESN has not been activated, as the MTN has no PRL/*288 indicator and are acting as placeholder ESNs, unable to use the services sold.
>
> Please work back with Elliott to determine the details surrounding these transactions.  We further recommend contacting [the] former owners to determine the handling of the old handset (donated to HopeLine, left in store, asked to be recycled, gifted to the activating customer, etc.).  Please respond with your findings ASAP, and let me know if I can be of any assistance.

(Doc. 38-5 at 67-68; *see also id*. at 72.)

17

Before meeting with Carter, Griffin contacted the previous owners of the old handsets. He found that each handset used in the transactions at issued had been donated by the owner to the HopeLine program.   In emails dated May 29 and 30, 2012, Griffin told Michele Dennis, Human Resources, that he had talked with each customer whose old handset was used in the identified transactions, and they all told him they had donated their old handsets to the HopeLine program.  (*Id*. at 67.) Griffin did not talk to the customers to whom Carter had sold the new smartphones.  (Doc. 38-3 at 15 [Griffin's Depo. at 56]).

On May 30, 2012, Griffin interviewed Carter about the transactions, and Carter admitted to using the ESNs from HopeLine phones. (Doc. 38-1 at 31 [Carter's Depo. at 110-11]; doc. 38-3 at 27, 30 [Griffin's Depo. at 101, 116]; doc. 38-2 at 4.)  Carter told Griffin he had been doing these same type transactions for four years and performed the same type of transactions thousands of times. (Doc. 38-1 at 23, 31 [Carter's Depo. at 78, 110-11].)  Carter testified, however, that he never transferred an ESN number from a HopeLine phone to a new activation for a smartphone and he never used a Hopeline ESN number for an upgrade or new line of service; instead, he used a new phone on the new activation, then he transferred the new phone to the existing MTN.  (Doc. 38-1 at 23 [Carter's Depo. at 79-80].) He testified that he was taught to use the ESN from an inactive phone, like the phones in the HopeLine box, "when [he] first started working at Verizon," and that he had performed "that same transaction thousands and thousands of times."  (*Id*. [Carter's Depo. at 78].)

18

Griffin completed a South Area Termination Request Form between May 29, 2012 and May 31, 2012.  (Doc. 38-3 at 55.)  On this form, he noted the "Reason for Termination" was "Code of Conduct," and the "Triggering Event[s]/Date[s]" were as follows:

(1)     On 2/16/2012[,] Elliott activated an iPhone on MTN [***]-[***]-[***1].  He then moved the iPhone to mtn [***]-[***]-[***2].  Elliott then took esn [************X] from the Hopeline box and placed it on mtn [***]-[***]-[***1].  In doing so, the customer avoided the data charge on [***]-[***]-[***1] and now has a zero usage line that is subject to termination when the contract ends.

(2)     On 3/2/2012 Elliott activated a MOTXT894 on MTN [***]-[***]-[***3].  He then moved this device to [***]-[***]-[***4].  Elliott then took esn [************Y] from the Hopeline box and placed it on mtn [***]-[***]-[***3].  In doing so, the customer avoided the data charge on the new MTN and now has a zero usage line that is subject to termination when the contract ends.

(3)     On 4/28/2012 Elliott activated an iPhone on MTN [***]-[***]-[***5].  He then moved the iPhone to mtn [***]-[***]-[***6].  Elliott then took esn [**********Z] from the Hopeline box and placed it on mtn [***]-[***]-[***5].  In doing so, the customer avoided the data charge on the new MTN and was left with a zero usage line that was subject to termination.    (In this case the customer disconnected [***]-[***]-[***5] on 4/2/2012, incurring a $350 ETF)

(*Id* at 55.)   The Termination Request Form also contains a section entitled, "Employee Response/Mitigating Circumstance, if applicable."  (*Id*.)   In this section, Griffin wrote:

On May 30, 2012[,] I held a conference call with Elliott Carter, Terrence Jones, and Gabriel Warren, to discuss the three occurrences on which Elliott activated a new line of service to get the customers involved a smartphone which could then be moved to an existing upgrade ineligible MTN.  I explained to Elliott that the Compliance department had then noticed that on the same day a feature phone esn had been placed on the newly activated mtn. I further explained that ***I had contacted the previous users of the three mtns in question and that each confirmed that they had donated their device for Hopeline use.***  I then asked Elliott for his side of these three occurrences.

19

*Elliott then informed me that on each occurrence he had taken a phone from the Hopeline box with the intent of using the esn as a 'Dummy' to place on the newly activated line.* He stated that he would then move the newly purchased device to an existing upgrade ineligible mtn.  Elliott then stated that he was never aware that he could not take devices from the Hopeline box.  After I informed him that this is the very reason the box remains locked, Elliott reiterated that he never knew he could not remove devices from the Hopeline box.  After I told him that he was neither to use Hopeline devices nor to encourage customers to activate a line of service with the intent of switching esn, Elliott asked what to do if the customer brings in an old device for the purpose of switching esn. after a new activation.  I told him that he should then get a member of management involved per our Selling with Integrity training.  Elliott then stated that he would neither go in the Hopeline [box] in the future, nor would he encourage customers to activate a line with the intent of switching esn.  The conference call then ended.  Afterwards I [repeated the content of] the call to DM David Giegel, who informed me to find out whether Elliott had actually allowed his customers to leave with the Hopeline devices.  I called ASM Gabriel Warren and he asked Elliott about the devices.  Elliott informed him that he always put the devices back in the Hopeline box.

(*Id.* at 55-56 [emphasis added].)

With regard to the May 30, 2012, discussion, Carter testified that Griffin 'wanted me to explain to him about the transactions;" he recalled the conversation as follows:

[Griffin] said, Elliott, it's – it's three transactions I need to ask you about, and I said, Okay.  And he brought up the transaction and he said, Well, what happened?  He said, What occurred with the transaction?  I said, Well, I said, you see that I activated a new line of service and then I switched the new phone to the customer's existing number . . . on his account.  And I said, The customer signed the contract, [the] customer paid for the phone,  And I said, . . . *I used the old ESN out of the HopeLine box* in the – put that on the – on the new line of service [until] we got a – until we got a better phone, and I put the new – and I put the HopeLine phone back in the box.

           . . .

. . .  [Griffin] said, Elliott, well you know, from now on out, . . . you can't do any more transactions like that from now on.  And I said, I didn't know

20

because I've been doing it for the last four years.  And he said, Well, from now on, . . . I want you to do this for me.  I don't want you doing those type of transactions.

And then I asked him a question[.]  I said, Well, what if a customer comes in with their own existing phone that doesn't work?  He said, Well, they have to have a smartphone.  And I said, Well, when did they come out with the email of when did we do training on that particular procedure? . . . [H]ow come they can't come and – I mean, if they [have] an existing phone and it works and they wanted to use it, why they couldn't use it?  And he told me, well, I couldn't use – he said, Just don't do those transactions for them anymore.  I said, Okay, Ken.  And I didn't do it.  Or I didn't have a chance.

(Doc. 38-1 at 31 [Carter's Depo. at 110-12 (emphasis added)].)

Carter testified that he had no reason to believe that Griffin knew that any other retail sales representative had performed any similar transactions using a phone from the HopeLine box.  (Doc. 38-1 at 31-32 [Carter's Depo. at 113-14.]  Griffin testified that he had not seen any other employee use the ESN from a HopeLine phone, but he had heard about other employees doing the same thing as Carter.  (Doc. 38-3 at 16 [Griffin's Depo. at 58-59].)  Giegel testified this was a "company problem" because compliance was looking into these transactions.  (Doc. 42-3 at 22-23 [Giegel's Depo. at 84-85].)  Kerry Gould testified this was a region-wide problem, but Carter was the only person he could name that was terminated.  (Doc. 42-18 at 18 [Gould's Depo. at 66-68].)

Griffin never asked Carter the names of the other employees who were conducting these same transactions and he never did anything to investigate the other employees despite the fact there were only nine or ten employees in Griffin's store.  (Doc. 38-3 at 27-28 [Griffin's Depo. at 101, 104-06].)

Griffin testified as follows:

> Q. . . . [W]hat was the issue with Elliott Carter? . . . Did it have to do with him doing something with a HopeLine phone or doing something with an inactive ESN?
>
> A. **It was the HopeLine phone being used.**  Then it was the fact that when you activated the new line, okay, it had a data package on it to begin with, okay?  When you transferred that new data-capable phone to the existing line that already had a data package on it, and **you put the ESN of a basic phone on there, that data package went away, so revenue went away for Verizon.**

(Doc. 38-3 at 17 [Griffin's Depo. at 61 (emphasis added)].)  Griffin requested Carter be terminated and filled out the termination request form and submitted the termination form to HR.  (Doc. 42-12.)

HR received the completed Termination Request Form on May 31, 2012, and "recommend[ed] termination."  (Doc. 38-3 at 57.)   Dennis talked to Griffin and relied on what Griffin had told her.  (Doc. 42-2 at 30-31 [Dennis's Depo. at 115-17].)  Therefore, based on the information captured in the Compliance Report, the investigation by Bryant, the investigation by Griffin,  and Carter's admission that he used HopeLine phones in transactions not authorized by the persons who had donated the phone, Cellco terminated Carter's employment on June 7, 2012, approximately two weeks after he had complained about race and gender discrimination.  (Doc. 38-1 at 21 [Carter's Depo. at 73; doc. 38-3 at 15 [Griffin's Depo. at 53, 55]; doc. 42-11.)

On that day, Griffin was away from the Tuscaloosa store on June 7, 2012, and Gould told Carter he was terminated.  (*See* doc. 42-11.)

### III. DISCUSSION

Carter raises three claims in his Amended Complaint:  Count One – "Racial Discrimination/Harassment Claims," Count Two – "Title VII and 42 [U.S.C.] § 1981 Retaliation Claims," and Count Three – "Title VII Gender Discrimination Claims."  The Amended Complaint alleges claims for disparate treatment and retaliation based on the BAE selection decision and his termination.  It also contains allegations of harassment.  At a hearing on Cellco's Motion to Compel, counsel for Carter informed the court that Carter was not pursuing claims of discriminatory or retaliatory harasssment.  Therefore to the extent such claims are set forth in the Amended Complaint, they will be dismissed.

### A.  PROMOTION

When a plaintiff seeks to establish a claim of employment discrimination by circumstantial evidence, the court analyzes such claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Burdine*, 450 U.S. at 252-53.  If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802.  If defendant succeeds in carrying this burden, then  plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives, in this case, race discrimination or retaliation.  *Burdine*, 450 U.S. at 253.  At all times, plaintiff bears the burden of

23

persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

### 1. Prima Facie Case

To establish a prima facie case of race and/or gender discrimination with regard to promotion decisions, plaintiff must prove:

> (1) that [he] belongs to a protected class; (2) that [he] applied for and was qualified for a promotion; (3) that [he] was rejected despite [his] qualifications; and (4) that other equally or less-qualified employees outside [his] class were promoted. The comparators for the fourth prong must be "similarly situated in all ***relevant*** respects."

*Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004))(emphasis added). Cellco alleges that Carter cannot establish a prima facie case because he cannot prove Harris was similarly-situated to him; it contends: "The undisputed facts show that each employee that Pate hired for BAE positions participated in the Mentor Program that she had developed. Carter did not participate in the program, and, therefore, was not similarly situated to the employees that

24

Pate hired." (Doc. 37 at 33 [citing Pate Dep. at 42:13-48:16; Carter Dep. at 35:13-36:4 and

Ex. 1].).

However, the extent to which Pate's subjective requirement for the applicant to have

participated in her mentor program was a motivating factor is better reserved "for the rebuttal

stage of the *McDonnell-Douglas* framework." *Mortham*, 158 F.3d at 1190.

To demonstrate that she was qualified for purposes of a prima facie
case, a plaintiff need only show that she satisfied an employer's objectively
verifiable minimum qualifications for the sought position. *See Vessels v.
Atlanta Ind. Sch. System,* 408 F .3d 763, 769 (11th Cir.2005);[3] *Carter v. Three
Springs Residential Treatment,* 132 F.3d 635, 643 (11th Cir.1998). **Subjective**

---

[3]The *Vessels* court held:

[T]o demonstrate that he was qualified for the position, a Title VII
plaintiff need only show that he or she satisfied an employer's objective
qualifications. The employer may then introduce its subjective evaluations of
the plaintiff at the later stages of the *McDonnell Douglas* framework. A
contrary rule, under which an employer's subjective evaluation could defeat
the plaintiff's initial prima facie case, cannot be squared with the structure and
purpose of the *McDonnell Douglas* framework. Specifically, we have made
clear that the prima facie case is designed to include only evidence that is
*objectively verifiable* and either easily obtainable or within the plaintiff's
possession. *Walker v. Mortham,* 158 F.3d 1177, 1192–93 (11th Cir.1998).
This permits the plaintiff who lacks direct evidence of invidious intent to force
the employer to articulate its motives for the challenged employment action so
that the plaintiff has an opportunity to show intentional discrimination by
circumstantial evidence. *Id.* If we were to hold an employer's subjective
evaluations sufficient to defeat the prima facie case, the court's inquiry would
end, and plaintiff would be given no opportunity to demonstrate that the
subjective evaluation was pretextual. Such a blind acceptance of subjective
evaluations is at odds with the intent that underlies the *McDonnell Douglas*
framework. This is particularly important because we have emphasized that
subjective criteria can be a ready vehicle for race-based decisions.

*Vessels*, 408 F.3d at 769 (emphasis in original).

> *qualities and other characteristics that an employer might deem desirable*
> *but not necessarily required, on the other hand, are appropriately considered*
> *at later stages of the McDonnell Douglas framework. See Vessels,* 408 F.3d
> at 769; *Cooper v. Southern Co.,* 390 F.3d 695, 744 (11th Cir.2004) (plaintiff
> established that she was qualified but failed to show pretext with respect to
> employer's assertion that successful candidate was hired based upon having
> "the preferred type of bachelor's degree" and industry experience that the
> plaintiff lacked); overruled on other grounds by *Ash v. Tyson Foods, Inc.,* 546
> U.S. 454, 457 (2006); *Benson v. Tocco, Inc.,* 113 F.3d 1203, 1209 (11th
> Cir.1997) (where employer's advertisement stated that "a minimum of two
> years" of experience with computer software program was "ideal" but not
> required, plaintiff established that he was qualified for purposes of a prima
> facie case despite not having the two years experience).

*Howell v. Morrison Mgmt. Specialists, Inc.*, No. 4:10-CV-1587-RDP, 2013 WL 6568935, at *11 (N.D. Ala. Dec. 13, 2013)(emphasis and footnote added).  The internal Position Information for the BAE position did not include participation in Pate's mentor program as a qualification or requirement for the position.  (Doc. 42-19 at 2-3.)  Therefore, the court finds, for purposes of deciding whether Carter has shown a prima facie case, participation in the mentor program is not a "relevant respect" for determining whether Harris and Carter were similarly situated.  Therefore, Harris's participation in the mentor program is not a sufficient distinction to prevent her from being a proper comparator.  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005).

The court finds that Carter has established a prima facie case of discrimination with regard to his non-selection for the BAE position received by Harris.

### 2. Articulated Non-Discriminatory Reason

"Once a prima facie case is established, a defendant must proffer legitimate, nondiscriminatory reasons for its employment decision." *Damon v. Fleming Supermarkets,*

26

196 F.3d 1354, 1361 (11th Cir. 1999)(citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d

1428, 1432 (11th Cir. 1998)).   Cellco has presented evidence that Pate selected Harris

instead of Carter because Harris had participated in her mentor program.   This evidence is

sufficient to meet Cellco's burden of production.

### 3.  Pretext

If a defendant carries its burden of production, "the presumption of discrimination

[created by plaintiff's prima facie showing] is eliminated, and the plaintiff must submit

evidence showing that the articulated reason is pretextual.  If pretext is established, summary

judgment in favor of the defendant is generally inappropriate."   *Walker v. Prudential*

*Property & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002)(citing *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Chapman v. AI Transport*, 229 F.3d 1012,

1025 n. 11 (11th Cir. 2000); *Combs*, 106 F.3d at 1538).   A plaintiff may establish that an

articulated reason is a pretext for unlawful discrimination "either directly by persuading the

court that a discriminatory reason more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of credence."   *Carter v. City*

*of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*,

758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Burdine*, 450 U.S. at 256)).   If a plaintiff

chooses to establish pretext by showing that his employer's proffered reason is unworthy of

credence, he must attack that reason "head on and rebut it."   *Chapman*, 229 F.3d at 1030.  He

must  offer  evidence  that  "casts  sufficient  doubt  on  the  defendant's  proffered

nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's

27

proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.* , 37 F.3d 603, 605 (11th Cir. 1994)).; *see also Damon*, 196 F.3d at 1361.

The "pretext analysis focuses on a narrow question:  Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Prudential*, 286 F.3d at 1276 (citations omitted). "'Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.'  When evaluating a charge of employment discrimination, then, [the court] must focus on the ***actual knowledge*** and ***actions*** of the ***decision-maker***." *Id.* at 1274 (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir.2001) and citing *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir.2001))(emphasis added).

The record contains evidence that Harris, the applicant selected for the BAE position did not participate in a formal mentoring program.  Harris testified that Pate, the decision-maker, was like a mentor and that she would talk to other BAEs when they came to the Tuscaloosa store where she was working.  Harris, unlike Moon and Heckle – previously selected applicants for BAE positions, did not ride along with BAEs on sales call or listen to BAEs make telephone sales calls.  This lack of a formalized program or any real substance to the mentor program may be sufficient to support a finding that reliance of the mentor program in the selection of BAEs is insufficient to have motivated Pate's decision.

Also, and perhaps most telling, Pate did not interview any other candidates and, in fact, attempted to disguise her failure to interview Carter by creating a false Interview

Evaluation form.  Viewing the evidence in the light most favorable to the plaintiff, Pate created the Interview Evaluation form for Carter after she had selected Harris for the job and she rated him as unqualified without reason.  Moreover, a reasonable jury could find that Pate, with or without input from Griffin, created the negative evaluation on the day that Carter complained to Griffin that he was not selected for the BAE because of his race and gender.

Finally, the court finds the fact that Pate never hired an African-American BAE, together with consideration of the other evidence of record is sufficient to allow a reasonable jury to conclude that the articulated reason is unworthy of credence and the real reason Carter was not selected was his race and his gender.

Therefore, Cellco's Motion for Summary Judgment as to Carter's promotion claim will be denied.

## B.  TERMINATION

### 1.  Prima Facie Case

#### a.  Race and Gender Discrimination

"When, as here, the plaintiff claims that his employer discharged him on account of his race [and/or gender], he must establish four elements:  (1) that he is a member of a protected class . . . ; (2) that he was qualified for the position he held; (3) that he was discharged from that position; and (4) that in terminating his employment, his employer treated him less favorably than a similarly[-]situated individual outside of his protected class

. . . . *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011)(citing *Maynard*

*v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir.2003)(citing *McDonnell Douglas*, 411 U.S.

at 802)).   Cellco contends that Carter cannot establish a prima facie case of discriminatory

discharge because he "has no evidence that the Compliance Department from Verizon

Wireless discovered that other employees were making similar fraudulent transactions, and

that those employees admitted to making the transactions but were not fired."  (Doc. 37 at

17.)   Carter contends that he can "by-pass the 'similarly situated' prong by demonstrating

that he was replaced by someone outside his protected class."  (Doc. 41 at 38 [citing

*Maynard*, 342 F.3d at 1289].)  The court agrees.

In this Circuit, the law is well establish that, "[a] prima facie case of discriminatory

discharge may be established in different ways.  One way is the method recognized by

[defendant]:  a member of a protected class makes out a prima facie case if he establishes

that he was qualified for the job, but was fired and ***replaced by one outside the protected***

***class***."   *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir.

1984)(citations omitted).

In the instant action, Carter has presented evidence that he was replaced by a white

female.  (Doc. 42-4 at 6, ¶ 18.)  Therefore, the court finds that Cellco is not entitled to

summary judgment based on Carter's failure to prove a prima facie case for discriminatory

discharge.

### b.  Retaliation

In order to establish a prima facie case of retaliation in violation of Title VII and Section 1981, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal relationship between the protected expression and the adverse action. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008). Cellco contends that Carter cannot establish a prima facie case of retaliation based on mere temporal proximity alone because such evidence alone does not satisfy "but for" causation and because Bryant notified Griffin of Carter's wrongdoing before Carter's complaint. The court disagrees.

The court finds that whether or not Carter can establish but-for causation sufficient to prove retaliation is better decided after the court determines whether or not he has established a prima facie case.

In an unpublished opinion the Eleventh Circuit held:

> Title VII forbids an employer from retaliating against an employee because he has opposed "an unlawful employment practice." 42 U.S.C. § 2000e-3(a). The Supreme Court recently held that a plaintiff must demonstrate that his protected activity was the "but-for" cause of the adverse employment decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. ——, ——, 133 S. CT. 2517, 2534, 186 L ED.2d 503 (2013).

> When a plaintiff produces only circumstantial evidence to prove Title VII retaliation, this Court uses the burden shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. CT. 1817, 36 L ED.2d 668 (1973). *Brown v. Ala. Dep't of Transp.,* 597 F.3d 1160, 1181 (11th Cir.2010). [Footnote] Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of retaliation, which creates a presumption that the adverse action was the product of an intent to retaliate. *Id.* To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in an activity protected under Title VII, (2) he suffered an adverse

31

employment action, and (3) a causal connection between the protected activity and the adverse action exists.  *Id.*

> [Footnote:]   We conclude that the *McDonnell Douglas* framework continues to apply after the Supreme Court's *Nassar*, holding that a plaintiff must demonstrate "but-for" causation when making a Title VII retaliation claim.  *See Nassar*, 133 S. Ct. at 2534.  In reaching its conclusion in *Nassar*, the Supreme Court relied on its earlier decision in *Gross v. FBL Financial Services*, 557 U.S. 167, 129 S. Ct. 2343, 174 L Ed.2d 119 (2009), interpreting the Age Discrimination in Employment Act's ("ADEA") phrase "because of . . . age" and holding that a plaintiff must prove that discrimination was the "but-for" cause of the adverse employment action.  *See Nassar*, 133 S. Ct. at 2523; *see also Sims v. MVM, Inc.*, 704 F.3d 1327, 1333-34 (11th Cir. 2013) (holding that the *McDonnell Douglas* framework continues to apply to ADEA cases after the Supreme Court's decision in *Gross* ).

> "Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (quotation marks omitted).  If the defendant carries this burden, the plaintiff then must show that the legitimate reasons offered by the employer for taking the adverse action were pretexts for unlawful retaliation, *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir.2001), **and** that the plaintiff's protected activity was the "but-for" cause of the adverse action, *see Sims v. MVM, Inc.,* 704 F.3d 1327, 1334 (11th Cir.2013) (ADEA); *Nassar,* 133 S. Ct. at 2534.

*Mealing v. Georgia Dep't of Juvenile Justice*, 564 Fed. Appx. 421, 426-27 and n.9 (11th Cir.

2014)(emphasis added), *cert. denied*, 135 S. Ct. 1165 (2015).[4]

---

[4]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it.  ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

The court finds that the Eleventh Circuit has indicated its intention to continue to apply the *McDonnell Douglas* framework to Title VII retaliation claims and to decide whether retaliation was the but-for cause of an adverse action at the pretext stage.

The court finds that Carter has established a prima facie case of retaliation with regard to his termination.  Viewing the evidence in the light most favorable to Carter, the non-moving party, the court finds Carter complained to Griffin that he was not selected for the BAE position because of his race and his gender.  Although the evidence is not clear as to the precise day this complaint was made, from the record, the court discerns that it was sometime after May 17, 2012 – the day Pate interviewed Harris – and before May 23, 2012 – the day Pate said she talked to Carter, which, accordingly to Carter, was after Harris had been selected for the position and he had complained to Griffin about discrimination.  On the same day Pate said she had "interviewed" Carter, May 23, 2012, Bryant sent the email to Griffin regarding Carter's HopeLine telephone transactions.  The Bryant email is the instigating event that lead to Carter's discharge on June 7, 2012.  The court finds that the concurrence of Carter's complaints and the events leading to his termination demonstrated that these events are not totally unrelated.

Therefore, the court finds that Cellco is not entitled to summary judgment based on Carter's failure to prove a prima facie case of retaliatory discharge.

### 2.  Articulated Reason

"Once this presumption [of discrimination or retaliation] is raised by establishing a prima facie case, '[t]he burden then shifts to the employer to rebut [it] by producing evidence

that [the employer's] action was taken for some legitimate, non-discriminatory [and non-retaliatory] reason.'" *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011)(quoting *EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir.2002)(citing *Burdine,* 450 U.S. at 254-55)); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)(citing *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995)).

Cellco contends that it "has met its 'exceedingly light' burden of providing a legitimate, non-discriminatory and non-retaliatory reason for Carter's discharge:  namely, his use of ESNs from Hopeline devices to process fraudulent transactions."  (Doc. 37 at 23.) This reason is sufficient to shift the burden back to Carter to show either (1) Cellco's articulated reason is unworthy of credence or (2)(a) that Carter's race or gender played a factor in his termination or (2)(b) that retaliation was the but-for cause of his termination. *See Burdine*, 450 U.S. at 256; *Mealing* 564 Fed. Appx. at 426-27 and n.9

### 3.  Pretext

The law in this circuit is well established:  A plaintiff may not establish pretext merely by quarreling with the wisdom of the alleged discriminatory and/or retaliatory decision.  *Combs*, 106 F.3d at 1543.  If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it."  *Chapman*, 229 F.3d at 1030.  He must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not

what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.* , 37 F.3d 603, 605 (11th Cir. 1994)).; *see also Damon*, 196 F.3d at 1361.

The "pretext analysis focuses on a narrow question:  Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Prudential*, 286 F.3d at 1276 (citations omitted).  "'Discrimination [and retaliation are] about actual knowledge, and real intent, not constructive knowledge and assumed intent.'  When evaluating a charge of employment discrimination, then, [the court] must focus on the ***actual knowledge*** and ***actions*** of the ***decision-maker***."  *Id.* at 1274 (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir.2001) and citing *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir.2001))(emphasis added). The relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  "To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons [have] no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th

Cir. 1995)(Johnson, J, concurring)(citations omitted).  However, "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)).  "In other words, it does not matter whether the plaintiff is *actually innocent* of the infraction for which the adverse employment action is taken; the only relevant inquiry is whether the employer *believes* he is guilty."  *Masso v. Miami-Dade County*, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007)(emphasis added).  "No matter how medieval [an employer's] practices, no matter how high-handed its decisional process, no matter how mistaken [its] managers, [Title VII ] does not interfere.  Rather [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(other citations omitted).

Carter contends that Cellco's articulated reasons for his termination are unworthy of credence:

> First, there is no policy or documentation which states an employee would be terminated for using the ESN number from a Hopeline phone or dummy ESN. The selling with integrity documentation does not outline any policies relating to ESN's.  Carter was never disciplined or counseled for these transactions or trained to handle transactions differently; rather he was terminated for the first occurrence.  Carter honestly told Griffin he never knew he was not supposed to use the dummy ESN's from Hopeline phones, other employees were conducting the same type of transactions, and he was never trained otherwise. Griffin never investigated whether any other employees were committing the same transactions, he just terminated Carter, the one employee who had just

weeks before complained to him about discrimination.  Griffin was told by management that other employees were using this practice in the region, he heard of other employees doing the same, yet he took no steps to determine whether this was true.

In fact, the practice was wide-spread and condoned by Verizon:  The declaration testimony of Kathy Williams and Cedric Atchison preclude summary judgment because their testimony directly contradicts Verizon's position.  Both Williams and Atchison state that the practice which Carter utilized to set up phone service was utilized throughout stores managed by the same District Manager and Floater/Assistant District Manager and was known, encouraged, and ordered by Verizon management.

(Doc. 41 at 36-37.)

Although the court finds that Carter has presented an issue of fact as to whether other employees used ESN numbers off Hopeline phones as a placeholder for the new telephone number, the court finds Carter has not disputed the evidence regarding Josh Bryant's notice to Griffin regarding the use of the ESN numbers from previously owned devices, Griffin's investigation showing that the previously owned devices were donated to the HopeLine program,  and Carter's subsequent admission to Griffin that he had removed the phones from the HopeLine box to complete transactions.   Nothing in the record indicates that the compliance department was aware of any other employees using the HopeLine phones for this purpose.   Even if the court assumes that employees used the HopeLine phones for similar purposes, the court has no evidence that Bryant, who instigated the investigation of Carter, and/or Griffin, who interviewed Carter about the transactions and recommended his termination were aware of other employees using the HopeLine phones in such a manner and did not take action.  Based on these faces, viewed in the light most favorable to Carter, the

court finds Carter has not demonstrated that Cellco's articulated reason for his termination is unworthy of credence and that the real reason was his race or gender discrimination or retaliation.

Therefore, the court finds that Cellco's Motion for Summary Judgment will be granted and Carter's claims based on his termination will be dismissed.

<u>**CONCLUSION**</u>

For the foregoing reasons, the court is of the opinion (1) that there are material facts in dispute and defendant is not entitled to judgment as a matter of law as to plaintiff's promotion claims and (2) that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to plaintiff's termination claims.  Pursuant to statements made in open court, plaintiff's claims of discriminatory and retaliatory harassment will also be dismissed.

An Order denying in part and granting in part defendants' Motion for Summary Judgment, (doc. 36), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 31st day of March, 2016.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE